**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACARI FRANKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 cv 3035 |
| | ) | |
| CITY OF CHICAGO and CHICAGO POLICE OFFICERS JOSEPH BYRNE, Star #5304, ROBERT CAULFIELD, Star #11321, and DAVID PASILLAS, Star #17798, | ) | Judge ROWLAND |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF SHAQUILLE CREWS**

I, SHAQUILLE CREWS, do hereby swear or affirm, under penalty of perjury, that I am competent to give the following statement based upon my personal knowledge, and that the following statement is true and accurate to the best of my knowledge:

1. I am SHAQUILLE CREWS, I am over the age of 18, and my current address of residence is 9616 S. Loomis, Chicago, Illinois 60643. S.C

2. I am the friend of Jacari Franklin and have known him since we were in elementary school; because of that, I often refer to him as my cousin.

3. On 28 March 2018, I went to the shooting range with my girlfriend. We drove her car, a red Nissan.

4. As she was driving, I rode in the passenger seat. I placed the gun that I used at the range under the front passenger seat.

5. She then went to work and I drove to pick up Jacari because he wanted to see his newborn son. I forgot to return to the house to drop off my gun before picking up Jacari.

6. On my way to drop off Jacari, I needed to stop at a friend's house to grab something. The address of my friend's address is 8732 S. Union, Chicago, Illinois.

7. About 10 seconds after we exited my friend's house—and as we were getting into the car—I noticed a tan car pulling up behind us on the street. I was getting into the driver's seat and Jacari was getting into the passenger seat.

8. When I looked up, I noticed police officers. There were three of them—one at my window, one by the trunk of my car, and one that was getting out of the police car.

9. The officer at my window told me to get out, so I got out of the car and asked what was going on.

10. I do not exactly remember his exact words, but he said words to the effect of we did not have a light on our license plate.

11. At that time, I informed him that I was driving my girlfriend's car.

12. The officer then said he smelled weed on us but we were not smoking and I told him that.

13. After that, the officer asked, words to the effect of, whether there was anything in the car that he should know about.

14. During this whole exchange, Jacari was still seated in the front passenger side of the vehicle.

15. After the officer asked whether there was anything in the car, I told him that my gun was in the car and I had my FOID card. That was when I pulled out my FOID card to showed it to him. It was at that time, that an officer pulled Jacari out of his seat and told him to step out of the car.

16. I told the officer where I put the gun—under the front passenger seat—and the officer that pulled Jacari out of the car retrieved my gun from where I told them it was located.

17. As soon my gun was found, I was handcuffed.

18. I repeatedly told the coops that I had my credentials for the gun and kept asking them what was going on. They just kept repeating that we needed to, "hold tight."

19. It was around this time that I also told the officers that I had my concealed carry permit coming. I had already taken all of the classes for my concealed carry permit and was just waiting to receive the official documentation in the mail.

20. The one who pulled me out of the car stayed by me while the other two officers were talking to each other.

21. While we were waiting for the cops' backup to arrive, the officer who pulled me out the car gave my FOID card to the third officer who'd been standing back by the trunk. That officer then went into the police car.

22. When the backup unit arrived, the officer who stopped me took me out of the handcuffs.

23. The cops kept trying to get me to say that the gun was Jacari's. They kept telling me, "come'on man, you know this ain't your gun" but that didn't make sense. I asked them how he could have a gun that was registered to me?

24. At that point, the cop said something slick. I do not remember his exact words but I do remember going back and forth with the officers. I told them that if anything, they should be taking me in since it was my gun but that did not make sense either because I had all my paperwork.

25. It did not seem like the cops cared.

26. A few minutes after the backup unit arrived, the three officers who stopped us told them to put Jacari in the back of their car. He was then placed in the back of the assist unit's car.

27. When I saw this, I asked what was going on? I was concerned that they were going to tow my girlfriend's car. When I voiced this, they asked me if I wanted them to tow the car.

28. When I told cops I did not want the car to get towed, the officers said that I needed to leave then—so I left.

29. At the time that I left, the police were still there.

30. When I found out that Jacari was charged with unlawful possession of my gun, I got a copy of the receipt showing that I purchased the gun.

31. Exhibit A, attached hereto, is a true and accurate copy of the receipt that I

32. I showed up at his first court date on 111th Street with a copy of the receipt but they would not let me present it.

33. Jacari did not have an attorney at that time so I gave it to the public defender who made a copy of it and said that he would put it in Jacari's file.

34. At no point has Jacari ever owned, possessed, or used my gun.

35. At no point did I or Jacari ever tell the officers who stopped us that Jacari ever owned, possessed, or used my gun.

36. In fact, I told the officers repeatedly the exact opposite: that it was my gun not Jacari's and that he had nothing to do with it.

37. On 1 October 2019, I called Jacari Franklin's attorney and requested that she help me submit an affidavit for his case because I am leaving the state for work.

FURTHER AFFIANT SAYETH NOT.

10/05/19
Date

[signature]
Signature

Subscribed and sworn to before me,
this 5 day of October, 2019.

[signature]
NOTARY PUBLIC
My commission expires: 7-6, 2022.

"OFFICIAL SEAL"
SHERRY SPENCER
Notary Public, State of Illinois
My Commission Expires 3/6/2022

With a receipt: Items returned with a receipt will be exchanged or refunded at the original purchase price plus applicable sales tax.

Without a receipt: Items returned without a receipt will be processed at the lowest sale price plus applicable sales tax. Such

10/20 4:50pm

Cabela's
WORLD'S FOREMOST OUTFITTER

5225 Prairie Stone Pwy
(847) 645-0400

ST#00021 RG# 102 TR# 3797 10/17/2017

LAYAWAY SALE
LAYAWAY ACCOUNT
21791860903

CREWS, SHAQUILLE
[redacted]
CUSTOMER ID# 2100190020

OCTOBER LAYAWAY

| | | | |
|---|---|---|---|
| 003467050 | M&P SHIELD .40 7+1 | 1T | $349.99 |
| ID: 006382142 | | | |
| LDN6365 | | | |
| On Layaway: | $349.99 | | |
| Original Price: | $449.99 | | |
| 002526514 | IL BACKGROUND CK | 1N | $4.00 |
| On Layaway: | $4.00 | | |
| | Deposits Made | 1N | $413.97 |
| Payment On Account #: 21791860903 | | | |

| | |
|---|---|
| Subtotal | $413.97 |
| Tax | $0.00 |
| Total | $413.97 |
| Cash | $415.00 |
| Change | $-1.03 |

| | |
|---|---|
| Deposit Account #: 21791860903 | |
| Amount + Tax: | $415.98 |
| Payments Made: | $413.97 |
| Layway Balance: | $0.01 |